UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

MAFCOTE INDUSTRIES, INC.,
d/b/a MIAMI WABASH PAPER, LLC,
d/b/a ROYAL CONSUMER PRODUCTS, LLC,                                    PLAINTIFFS

v.                                                          CIVIL ACTION NO. 3:07-CV-419-S

ESTES EXPRESS LINES, INC.,                                              DEFENDANT

## MEMORANDUM OPINION

Miami Wabash Paper and Royal Consumer Products (wholly owned subsidiaries of Mafcote

Industries) hired Estes Express Lines to transport products to their customers. On a number of

occasions Estes did not effectuate delivery until after deadlines to which the plaintiffs and their

customers had agreed, resulting in the plaintiffs being assessed tens of thousands of dollars in late

fees. Thus Mafcote and its subsidiaries instituted this suit in state court, in which they blame Estes

for the delays and seek to hold it legally responsible for the consequences thereof. Estes removed

the case to this court, asserting both diversity of citizenship and that the case presents a federal

question because it is allegedly governed in part by the Carmack Amendment to the Interstate

Commerce Act, 49 U.S.C. § 14706, et seq. Estes disclaims liability on various grounds, and has

counterclaimed for something north of $225,000 in unpaid fees for its transportation services. It has

now moved for summary judgment both as to Mafcote's claims against it and as to its own

counterclaim.

A party moving for summary judgment has the burden of showing that there are no genuine

issues of material fact and that the movant is therefore entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c);  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60 (1970); *Felix v. Young*, 536

F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent

summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in the light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962). We address Estes's two summary judgment motions in turn.

# I

Estes argues that its shipping contracts with Mafcote were governed by its EXLA 105-L Rules Tariff, which sets out the conditions it places upon its various services. Specifically, Item 490 of Estes's tariff provides (in pertinent part) as follows:

> In no event will carrier be liable for any special or consequential damages arising from delay in delivery. Carrier makes no guarantees or warranties concerning delivery time. Any prior or contemporaneous representations regarding delivery schedules are acknowledged not to be binding on either party.

(Ex. A to Wilder Aff.) If this provision controls the parties' relationship, plaintiffs cannot recover.[1]

The products themselves were not damaged or made less valuable by the delay in delivery. Plaintiffs

---

[1]We note that carriers are free to limit or exclude liability for consequential damages unless some statute stands in their way. *See*, *e.g.*, *Kesel v. UPS*, 2002 U.S. Dist. LEXIS 12350, at *19 (N.D. Cal. Jan. 16, 2002) (enforcing a clause reading, "UPS shall not be liable for any special, incidental or consequential damages").

have not claimed any actual damages; they seek only consequential damages in the form of a third-party late fees.[2] So we must decide whether the Rules Tariff binds the parties. It does.

Plaintiffs' shipments with Estes are governed collectively by an "Agreement for Transportation"[3] and individually by bills of lading.[4] The overarching contract makes no mention of the tariff, but the bills of lading (each of which was apparently drafted and provided by the plaintiff-shipper) do. Specifically, the two sample bills (Ex. C, D to Wilder Aff.) both contain the following paragraphs (emphasis added):

> It is mutually agreed, as to each carrier . . . that *every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth . . . in the applicable motor carrier classification or tariff* if this is a motor carrier shipment.
>
> Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, including those written on the back thereof, set forth in the classification or tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

---

[2] *Compare Paper Magic Group, Inc. v. J. B. Hunt Transp., Inc.*, 2001 U.S. Dist. LEXIS 13494 (E.D. Pa. Aug. 29, 2001), *aff'd*, 318 F.3d 458 (3d Cir. 2003) (concluding that a shipment of 1998 Christmas cards was actually damaged when delivery was delayed until February 1999, at which point they could no longer be profitably sold).

Mafcote's statement that it "believes damages caused by failure to deliver with reasonable dispatch to be freight losses, and actual damage" (Resp. 12) is conclusory, unsupported, and unpersuasive.

[3] The Agreement for Transportation is dated September 1, 2000, but neither side disputes that it applies here; indeed, both parties have submitted it as an exhibit. We suppose that it automatically renewed in accordance with its terms and remained in effect at the relevant times.

[4] The record contains copies of only two bills of lading (one each in the name of Royal and Miami Wabash), but no one disputes that they are representative of the whole set.

This language unambiguously incorporates the carrier's tariff into the agreement,[5] so to survive summary judgment the plaintiffs must attempt to get out from under it.

They cannot do so. First they observe that the bills of lading contain, in addition to the above-quoted language, statements that "the delivery dates herein specified shall be deemed of the essence and the carrier shall be liable for consequential damages to the shipper or consignee for late delivery." This provision would have some force, and would create a tricky question of contract interpretation (what to do when a contract and an incorporated document contradict one another?), but as it happens the bills of lading do not articulate any delivery date. To be sure, they contain *shipping* dates, but neither one indicates a date on which delivery was required. The "of the essence" terms are without enforceable meaning.

Second, plaintiffs cite *Hillenbrand Indus., Inc. v. Con-Way Transp. Servs., Inc.*, 2002 U.S. Dist. LEXIS 12417, at *20-21 (S.D. Ind. June 19, 2002) for the idea that a reference to "the applicable tariff" in a shipping order (tendered in lieu of a bill of lading) is merely "a vague statement, obviously used formulaically on every Hillenbrand shipping order no matter the carrier[, that] does not show that Hillenbrand had actual notice of the liability limitation at issue." But the plaintiffs need not have had actual knowledge to be bound by a tariff expressly incorporated by their own bills of lading. *Hillenbrand* was a case in which a part of a shipment never reached its intended destination. The shipper sought to recover the value of the lost products, in accordance with the

---

[5] Additionally, when picking up a shipment, an Estes agent would typically affix to the bill of lading a "PRO sticker," which bore the statement: "Driver's signature ONLY acknowledges receipt of freight. Shipment is subject to applicable terms and conditions of the Uniform Straight Bill of Lading and the EXLA-105 series rules tariff." (*See* Ex. C. to Wilder Aff.) While are not convinced that this sticker on its own would be sufficient to incorporate the tariff, it is further evidence that the plaintiffs and their agents ought to have been aware of the tariff's existence and effects.

Carmack Amendment's general rule that a carrier is absolutely liable for the "actual loss or injury to the property caused by" the carrier. 49 U.S.C. § 14706(a)(1); *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1063 (7th Cir. 2000). A carrier can limit its liability for actual damage to a product if it meets certain requirements, which include "obtain[ing] the shipper's agreement as to [the shipper's] choice of liability" and "giv[ing] the shipper a reasonable opportunity to choose between two or more levels of liability." *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 186 (3d Cir. 2006) (citations omitted). *Hillenbrand* held only that a reference to the tariff in the shipping order was insufficient to establish that the shipper had agreed to a level of liability after being given a reasonable opportunity to choose between several. We are not in the same situation here, because the Carmack Amendment rules apply only where the goods being shipped are lost or damaged. The plaintiffs' goods were not lost, and the only damages alleged in the complaint accrued as the result of fees assessed by a third party. There is no evidence that the goods were made less saleable or valuable in and of themselves as a result of the delay; the fees were apparently assessed only in order to encourage prompt delivery. Consequently the Carmack Amendment does not cover the damages alleged here, and Estes has no need to fulfill the elements spelled out in *Emerson* to claim protection under its tariff. The tariff controls, and bars the plaintiffs from recovering the damages alleged in the complaint. Summary judgment for the defense is warranted.

## II

Estes has asserted a counterclaim for a total of $226,450.29 in unpaid transportation charges.[6]

---

[6] The original complaint sought $228,487.30, but Estes subsequently determined the actual amount to be less. (Mot. for Summ. J. 1, 3 & nn.1-2.)

Of this sum, $66,344.71 is ascribed to Royal and $160,105.58 to Miami Wabash.[7] (Mot. for Summ. J. 3 & n.2; Belcher Aff. ¶ 9.) These charges fall under three headings: original freight charges, discount removals, and collection charges.[8] Estes explains that it initially charged the defendants a discounted shipping rate, but that it assesses a 10% ($21 minimum per shipment) service charge if a bill remains unpaid 30 days after issuance of the invoice. Once an invoice is more than 30 days past due, Estes sends written notification of that fact. If the bill remains unpaid 15 days after signed receipt of the late notice or 20 days after Estes sent the notice, the shipper is charged the full, undiscounted shipping rate. So the first category of damages alleged is what Estes originally expected the defendants to pay, and the second is the difference between the discounted rate and the full charge. Finally, if Estes elects to proceed with a legal action or to refer delinquent charges to a collection agency, it adds a 30% fee on top of what is otherwise owed. (Mot. for Summ. J. 6; Ex. B. to Belcher Aff., Rules Tariff Item 720.) As we explained above, Estes's Rules Tariff was incorporated into each bill of lading through language written by Mafcote itself, so all these charges apply unless contradicted by some other controlling authority.

Royal does not contest any of the original charges against it. (*See* Pl.'s Resp. to Interrogs. 4-6.) Miami Wabash, however, claims never to have received 55 of the invoices for which Estes seeks to hold it responsible, and therefore argues that it owes only $29,387.63. (*See id.*) That denial, backed up only by a copy of an "Account Detail Report" marked up by Steve Gilliland (whose

---

[7] It's important here to distinguish between the subsidiary companies and the parent. Estes cannot hold Mafcote liable on its subsidiaries' debts unless it can "pierce the corporate veil." *See*, *e.g.*, *Louisville/Jefferson County Metro Gov't v. Hornblower Marine Servs.*, No. 3:06-CV-348, 2009 U.S. Dist. LEXIS 92351 (W.D. Ky. Oct. 1, 2009). It has to this point raised no piercing argument.

[8] Royal is alleged to owe $23,212.55 in freight charges $27,821.84 in discount removals, and $15,310.32 in collection fees. Miami Wabash is alleged to owe $54,878.56, $68,279.58, and $36,947.44, respectively.

identity is unclear and who was not, so far as we can tell, under oath when he reviewed the report), is not sufficient to create a material question of fact as to the amount of Miami Wabash's debt. Moreover, the mere fact that an invoice was not on file with Miami Wabash at some later date is not evidence that the money was not due. The record contains no affidavits or other testimony that would establish that the disputed amounts were either improperly billed or not owed at all. Consequently Wendy Belcher's sworn affidavit, written in her capacity as Estes's Credit Manager, is sufficient to establish damages as to this portion of Estes's claim. Miami Wabash has failed to create a genuine question of fact, and summary judgment is warranted against both Royal and Miami Wabash with respect to the whole of the original freight charges.

We turn to the discount removals. This issue is dispatched easily. The Agreement for Transportation between the parties[9]—the overarching contract that governed the whole of the relationship—states unambiguously that "CARRIER agrees that no penalties; loss of discount or interest will be assessed to SHIPPER for past due amounts." (Ex. E to Wilder Aff. (emphasis added).) And while Estes argues that the Rules Tariff controls in the event of conflict, the tariff itself provides that "[t]he Rules, and Charges provided in connection with such rules, published in this tariff will NOT apply[] to the extent conflicting provisions have been established either by written agreement or contractual arrangement with specific accounts and are maintained in the Offices of the carrier . . . ." (Pl.'s Ex. 2, Rules Tariff Item 163.) Estes makes no effort to get around this clause. The discount removals are not recoverable by the plain terms of the parties' contracts. The court will grant summary judgment *sua sponte* to Royal and Miami Wabash in this respect.

---

[9] Although the Agreement is nominally between Estes and Mafcote, all parties treat it at various times as governing everyone involved. We thus assume that it binds Royal and Miami Wabash.

Next we come to the 30% charge that Estes assessed because it had to bring its complaints to court. Royal and Miami Wabash argue that this is a "penalty" that Estes is not entitled to recover under the Transportation Agreement. Estes asserts that it is something else—a collection fee. We first note that the term "penalty" in the agreement does not appear to carry the same meaning as it does in ordinary contract law. A "penalty" is generally defined as a "term fixing unreasonably large liquidated damages" for breach. Restatement (Second) of Contracts § 356(1). Such a provision is unenforceable on grounds of public policy; no specific contract term is needed to avoid it. But the contract here does not envision a charge assessed for breach. It envisions a surcharge on "past due amounts." The definition is thus broader than in normal legal usage. Bearing this in mind, the court is of opinion that the "collection fee" is a penalty within the meaning of the transportation agreement provision quoted above. It is assessed only once an account is overdue to the point of Estes having to resort to legal action, and penalizes the shipper for allowing itself to fall so far behind in its accounts. Because Estes contracted away its right to enforce such a clause, the court will also grant summary judgment *sua sponte* here.

Finally, Estes has requested an award of prejudgment interest, which courts normally award in cases of nonpayment of freight charges. *See Coliseum Cartage Co. v. Rubbermaid Statesville, Inc.*, 975 F.2d 1022, 1026 (4th Cir. 1992); 2 Saul Sorkin, Goods in Transit § 11.07. Here, however, Estes has bargained away its right to collect interest on past due amounts. It is not entitled to more than the benefit of that bargain. Its recovery will therefore be limited to the discounted freight charges that remain in arrears.

The court will issue a separate order in accordance with this opinion.